The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning, please be seated. Alright, we're prepared to begin with our first case on Brady v. City of Myrtle Beach. So when you're ready, we'd be glad to hear from you. May it please the Court. Thank you for allowing me to present arguments this morning on behalf of my clients, J.B. and H.M. Enterprises, Inc., Danny Group, LLC, Blazian Promotions and Company, LLC, and Hector Melendez. This case is based on our belief that the City of Myrtle Beach ambitiously discriminated against minority borough owners in the City of Myrtle Beach. They abused their police power to harass them, basically make their businesses impossible to function, all for the purpose of ridding an area in the City of Myrtle Beach known as the Superblock. It's almost a pentagram-shaped series of strip malls that all circle a central parking area. My clients all ran nightclubs, minority nightclubs, in which the clients— You've thrown up an awful lot of claims, haven't you? I don't think so, Your Honor. In terms of—what do you mean by claims? I was wondering if there was any part of the Constitution that you neglected. Would you call it a Hail Mary complaint? No, Your Honor. I thought it was very pointed and specific. And there's actually a case that I've cited out of Kentucky, Covington, where exactly what we complained of, the district court allowed that to move forward, saying that they did set a claim for a 1985 conspiracy. We think it's one of two things. You say if you throw enough against the wall, you hope something will stick? Well, Your Honor, I think we threw a lot against the wall in this case. We have the city manager, the mayor, the police chief, all of them saying these were—there's no question they were owned by minorities. And they all said these were minority nightclubs. They were black clubs. Can I just clarify what—because there are a lot of claims—what particular claims you're talking about? Because I thought the one claim you didn't bring was an equal protection claim. That seemed to be pretty clear. So you're not arguing equal protection right now, are you? No, we're arguing just a violation of their—they took away their rights to operate their business based on the fact that we believe there's evidence that they were minority clubs. They wanted to rid the Superblock of the minority clubs, as they stated in their emails. You did make a motion at the end of the defendant's case to amend the pleading. So are you not arguing that you made that motion before the court? Yes, ma'am. So you did request the district court to add the equal protection claim to the complaint? Yes, and that goes back to the original—the first DV. He said, I don't think you brought a Monell claim, and I thought we had made it. Is there any—can you point to any place in the record at the end of the plaintiff's case that you did make that request to the court? Because it looks like you just asked to add a party, but you never actually made the motion to add the equal protection claim at the end of your case. I don't—I know there are two separate—we made a Rule 15 motion at the first DV, at the conclusion of my case. And then at the end of—when he changed the arguments as to why we should not be able to move forward, that's when I said I thought all we've argued is equal protection in the entire case. So I wanted the evidence to conform with what had been—I mean, the claims that went to the jury to conform with what was presented at trial. Are you claiming that you are able to amend under 15b1 or 2? The distinction, Your Honor, I don't have the order—the motion—I mean, the rule in front of me. So the one, I believe, is about you have to—a party has to make an objection, and then you can—something that you presented in the evidence is not in the pleadings, and then you can make a motion to amend. Correct. And I believe the second is— To conform with the evidence presented at trial? It's by express or implied consent, and I don't think you have that here. No, I would agree Mr. Battle objected to that. But I disagreed with the judge that the pleadings did not contain those particular claims, and that was the secondary, I guess, argument that we just presented this to the— District judges can reject motions to amend on grounds of futility. Can they not? Yes, Your Honor, but I don't think that's the situation here because I think we showed— I mean, the judge even admitted that we demonstrated there was disparate treatment between my clients and the other owners in Myrtle Beach. So as a general matter, we have a beach town here, and like many beach towns, there's a cultural clash. There's a sort of strip along the beach towns. I've been to a great many of them where people during the season and on Friday and Saturday nights wish to let go, and I understand that. But then there's often in these beach cultures another group of people who want their community advertised as a family-friendly place and want their children to grow up with the idea that engaging in the kind of conduct that took place in the strip was not a teenage option. And my question is, given this cultural clash that exists in so many beach communities, why should the federal courts be the ones to sort it all out? Well, I think in this situation, we made the claim that they improperly targeted my clients and targeted these bars. And of course, their statement, their argument is what you're saying. But when you look at their justification for what they did with the nuisance ordinance, it is at best pretextual, if not fraudulent. Well, how can you say that they improperly targeted your clients? They brought in Mr. Coughlin, and he gave expert testimony, and he compared what they were doing in this community. He brought a national perspective to it and said this is well within the bounds of reason. And when I reviewed the record, I didn't hear that Mr. Coughlin's testimony was contradicted. Your Honor, he was – And he's saying that they acted reasonably, and that's the kind of thing that you would expect the locality to bring forward. And I didn't see any refutation of that. Your Honor, everything that he said in his testimony was refuted. He said they're trying to protect the patrons of Myrtle Beach. That is absolutely not true. The sundown meeting with Henry Brewington when they – the city attorney and the police chief brought a black man and a mixed race couple and said, yeah, we're not – you're getting out of my town. No violence had occurred at that point, none. Then you look at the emails. We've decided – David, the DRC said, you see, I'm getting rid of the bowlers. There's only one shooting that's occurred at that point, and it happened despite their testimony that's just absolutely false. It happened outside of the Brewington's club. It was their patron that left the club, gets shot on the street, and they shut down the club. Well, the difficulty here was, and the record shows, that the behavior that was concerning to the municipality was spreading into the parking lots and into the streets. It wasn't just what was in the club. It was the area surrounding the club. I understand that, Your Honor, but it's not spreading from the club. That is the Myrtle Beach – city of Myrtle Beach's property. If the property owner is responsible for crime on their property, the city has a very large problem because they didn't – the only thing they would do is park their cruisers in the parking lot to make sure patrons didn't go to the bars. Now, which constitutional provision are you claiming was violated? It's that they're taking their business. They are intentionally interfering with their business to shut them down so they can acquire the property. That was – What is taking? There's no imminent domain action here? Right. If they wanted the property, that's what they should have done. You're saying that there's a taking? Yes, Your Honor. So every police enforcement action is going to be a taking? This is not a police enforcement action. We didn't sue the police. This is the individuals that ran the city. No, but what you're saying is that when police come in, you can raise a targeting claim and that you can proceed under the takings clause? No. That's a pretty broad theory, isn't it? Your Honor, the targeting is clear because we've demonstrated the evidence that they didn't do this to the white boys. We have testimony from Jenny Brewington. We have the CAD reports that show – I mean, you have to understand. The city paid one of their own a $5 million profit for the worst hotels in the city of Myrtle Beach that are less than a quarter of a mile from the Superblock. And they said in their public statement that we have to buy these properties because they're so bad. I hear your argument, but the question still remains, why is this not a local matter? One of the things that we ask is whether the due process has been provided under the due process clause. And that's the job of the federal courts to make sure that procedural fairness is observed. Now, you had an opportunity. There was an investigation by the municipality to begin with. If you didn't agree with the denial of the license, there was the right to appeal to the city council. You could have been counseled there. You had a lawyer to make the case. And if the city council decided to approve the administrative meeting, you had a right then to go to court and contest it further. And so the question I have is you're making arguments about the degree of nuisance that this was and whether there were this many shootings or that many shootings. And I wonder why that argument isn't more appropriately made in, first of all, before the city administration, second of all, before the city government, third of all, before the state court system. You could have explored all of that and probably did. But why should the federal courts get into it when the community that is affected by these things and the people that are closest to these things are in the city of Myrtle Beach? Well, Your Honor, we were given an opportunity in our trial to let the citizens speak as to whether or not this is something that they approved. And I can tell you after the DV motion, they came to my clients and said, I'm sorry, we were going to give you everything you asked for. Was your process curtailed in the state? Yes, Your Honor. My clients are not wealthy people. They had spent $300,000 for the upfit of these bars, and they were not allowed to operate through the harassment of the police department and the city at the direction of the city manager. I mean, we have them. We have city employees. My clients testified to continual regulatory harassment. Rebuild the bar. It's a half inch off. And then they called him a stupid Mexican. And then the city. And back to your point as to whether or not the culture clash. The culture clash is what we're saying is racist. John Peterson said on the stand. Number one, if a guy comes in your club and pulls out a gun and wants to shoot somebody, there's nothing a business owner can do to stop that. Yet that's exactly what they did to my clients. They used that incident of somebody else coming into the club to do violence that he admitted on the stand they could not prevent and said that's why their license should be taken away. And what was the evidence that Peterson coordinated with law enforcement or told law enforcement he wanted the city to take these properties? The e-mails between himself and Gall and Mr. Seabock. And what did they say? David Seabock was the arm of the DRC. It was an arm of the city as admitted by the mayor. They were hired to be a straw buyer and buy these properties. That's not law enforcement, though. I'm asking about the law enforcement.  And then the e-mails go on. There are e-mails directly between Seabock, Peterson, and Chief Gall, the police chief. And before, I think it was immediately after the shooting outside of Pewry, he said, see, I told you so. We've got to get rid of all of them. And he's not talking about all the bars. He's talking about the minority bars in the Superblock. That is a statement from the chief of police who was sitting in the sundown meeting. So that's not – I asked you about evidence that Peterson shared his aspirations for the city to take over these properties or somehow influenced law enforcement to make these decisions. That doesn't sound to me like what you're talking about. Is there evidence of that? Yeah. Again, it's the e-mails between the DRC, Chief Gall, and Peterson where they're all discussing getting rid of the minority bars in the Superblock. I mean, that – I don't know that it was necessarily for acquisition, but they wanted the minority bars gone. Is this your 1985 conspiracy claim? Yes, sir. Well, what's wrong with members of the different parts of the city government talking among themselves? Is that a conspiracy? It is if they're talking about getting rid of minorities, in my opinion, Your Honor. I mean, that's what they're talking about. They all admit these are minority bars. All of the owners are minority. Am I over? I apologize. All right. I'm going to ask my co-panelists if they have any further questions. Thank you. Thank you. Mr. Humphrey. Thank you, Mayor. Please, the Court. The issues before this Court have little to do with the claims of racism that are appellants near singular focus. Appellants devote most of their arguments to points which the District Court did not reach or which are relevant to the issues which it did decide. Before the Court today are discrete questions of law on just three of appellants' causes of action for which there are no disputed facts. Because the District Court correctly answered those questions, this Court should affirm. I want to start with appellant's substantive due process claim because that's the only cause of action which all the appellants have challenged before this Court. Before we get there, can I ask you whether the District Court had any responsibility to take up the motion for a motion to amend the pleadings that was raised at the end of the defendant's case? I'm not aware of a motion to amend the pleadings being raised at the end of the case. The only motion to amend the pleadings that I've been able to find in the record was the motion made at the end of the plaintiff's case, whereas Judge Union noted during my friend's argument they asked to add pure ultra LLC as a party because there was some question as to whether Hector Melendez in his individual capacity could maintain these claims, and that motion was denied. I have yet to find a motion to amend to conform to the pleadings that was made at the end of the case to assert this amorphous Monell claim that they've raised. And I'll note that in their briefing, the appellants don't cite any portion of the record of the joint appendix where that motion was in fact made. The entire argument that they make is not about adding another party. They say that they made a motion to amend which, quote, specifically applied to a Monell claim. And even more specifically, they say it was a motion to amend the complaint to allege that if the city authorized John Peterson or anybody else, such that the Intercorporate Conspiracy Doctrine bars the 1985 claims, then they have a pattern or practice claim they can make under Monell. But again, I've yet to find that motion anywhere in the record. And I'm sorry, did you? So I have a portion here where the plaintiff's counsel said at the end, after the district court granted a directed verdict, he said, I made a motion at the end of the first directed verdict argument that if we didn't have a 1983 claim for equal protection, that I wanted to amend the pleading to conform with the evidence. So that's JA 942. He did say at the end, he said that after the directed verdict was granted, at which point any motion to amend would have been untimely. If you look back at the arguments of the first directed verdict motion, I can't find that motion that he's referencing. The only motion I can find during the first directed verdict argument is the motion to amend to add pure ultra LLC. And that's absolutely correct based on the record. But I think he did, even if he didn't make that motion before, he said, I'm renewing this, there was no motion that he made. But he did say at this point, I'd like to amend the pleadings to conform with the evidence. So you don't think that the district court was unnoticed to at least address that motion? Well, if the motion is made for the first time after the grant of a directed verdict, then the motion is untimely. And the district court did address this issue in his ruling on the motion for reconsideration, where he said there was no timely motion to amend, to add this Monell claim that was made during the trial. And it's inappropriate to raise it after the trial, either after a directed verdict, or as he mentioned, in that order, in a motion for reconsideration. The motions to amend are generally subject to an abuse of discretion. They are. Standard. And there's also a futility exception. You don't need to amend if it would be . . . unless it would serve some purpose. And the question I have is, what would the motion to amend add that was not already there? Well, the motion to amend would add nothing. And Judge Wilkinson, you're right. The motions to amend are committed to the sound discretion of the district court. Just to clarify, that's totally correct. But district court didn't rule on futility, right? The district court, in his order, has a long footnote saying there was this objection that supposedly sang about conforming the pleadings to the evidence. But that's not a conformity with Rule 15. That's not what happened here. That was an attempt to expand the pleadings in response to a DV motion. The court explained at length why he was ruling the way he was on that, and it's because there was no claim and no motion at all and just didn't comply with the rules, right? That's correct, Judge Rush. The judge did not reach the question of futility. Futility would be another additional reason, but we might review that de novo instead of for abuse of discretion, I would think. Well, this court has the ability to affirm for any basis appearing in the records of the court were to find that a motion to amend would have been futile. That's certainly within this court's wheelhouse to say so. A motion to amend to conform to the evidence, which this would have been, also requires proof that the evidence admitted would not have been relevant to any other claim that was properly raised. It has to relate to something new. And this issue did come up in the briefing where they have to show that they want to claim that the city somehow consented to the trial of an equal protection claim, that the evidence to support that claim would not have gone to any other claim that was pending before the court. And they make no attempt to explain how this claim for equal protection, which was never timely raised to begin with, would not have also supported their arguments. The case was pretty well fleshed out. I'm just not sure what the amendment would have added. I mean, the substantive due process claims have been explored up here. The equal protection claims, procedural due process claims, they've all been pretty well fleshed out up here. I'm just not sure, reading the record, what difference an amendment would have made to anyone, to anything, because the basics of the suits, the basis of the different views were pretty clearly set forth. That's correct. And there were other causes of action that were tried as well. Tortious interference with contract. They had a takings claim that that was tried. There was a civil conspiracy, not 1985, but a state law civil conspiracy claim that J.B., H&M had before the district court as well. So there's no contention that the Monell equal protection claim would have added anything to this case. In the briefing, they just refer to a generic Monell claim. Well, Monell did nothing more than allow municipalities to be named as defendants in 1983 suits. Prior to Monell, the courts- Looking through this, it seems that the one precedent that's as much of a roadblock to these various claims as any other is Judge Niemeyer's opinion in Sylvia Development. And Judge Niemeyer makes the point that substantive due process is very much out of favor at the Supreme Court. That due process is a procedural mechanism, first and foremost. That there's no substantive due process violation unless the action is wildly improbable. And unless there's no curative process. And when you look at our precedent in Sylvia Development, that's a hard case to get around in this particular lawsuit. And I have a fear if we started jumping into the middle of a cultural clash in a beach community, with Sylvia present, standing out there, that the Supreme Court might take a close look at that. And not just Sylvia, Judge Wilkinson, your opinion in Tri-County Paving, which was seven years after Sylvia announced the same principles. That both for procedural due process and for substantive due process, the availability of a procedure to cure the issue is absolutely relevant. And if there is a state law procedure to challenge the action, then that precludes a finding of any due process violation, whether it's procedural or substantive. And I'll also note that for both the procedural due process claims and the substantive due process claims, the district judge found that sufficient process was available. And the appellants never challenged that finding on appeal. So therefore, they have waived any argument before this court that insufficient process and procedure was provided. And that arguably renders the appeal of those calls to action. Well, it's not a pure zoning matter, but it certainly touches on local zoning authority. And some of the license applications were rejected for non-conforming uses under the zoning laws of the city. And our precedents have made clear that intervening in the local zoning process is something that the courts ought to undertake with the greatest of caution. That's exactly right. And that's, as you know, Judge Wilkinson, why the substantive due process case law has come down the way that it has. It's to avoid entangling federal courts in these sorts of issues where there is a specific procedure available. And it's also important to note that there's no alleged procedural irregularities that happened in how the license suspension and revocation decisions came down. The way the process works is a chief of police sends a request to someone in the finance office at the city recommending that license revocation. Is it odd that there was no Fourth Amendment claim here? We have everything else under the sun. We have substantive due process, procedural due process. I think we're missing quartering in this case as well. Because they did allege a violation generically of the first ten amendments to the Constitution. At trial, they did try to claim a Fourth Amendment violation saying that there had been improper search and seizure when police officers came into these bars and opened up the liquor cabinets and conducted investigation. But as was testified at trial by the expert. It makes you wonder. I was just reading the record. Well, why is there no Fourth Amendment claim here? And it could have been a tactical judgment that if you made a Fourth Amendment claim, you would have to get into probable cause. And the specifics of the probable cause here might not have been all that favorable to those whose licenses had been denied or those who were the subject of the police. They would explain why they had been there. And that might not have been that favorable. So I don't know. It just crossed my mind that that might have been a wise tactical judgment. Particularly given the evidence that for Itali's Bar and Grill and for Pure Ultra, because those businesses sold liquor, the SLED, the State Law Enforcement Division, and police had an absolute statutory right to come in at any time unannounced and inspect and search the premises to make sure they're complying with the liquor laws. And there's no allegation that the police coming into Natalia's or into Pure Ultra was somehow different in character or frequency or nature than the inspections that would have been conducted at any other bar. But to follow up on the substantive due process claim, even if you get past the hurdle to challenge the availability of process, there was absolutely process that was made available. In addition to this multi-layer review before the revocations even issued, the chief of police sent a letter. You start out with a presumption that this is a local matter and that the people of Myrtle Beach are going to be the ones that are going to be primarily affected and the people of Myrtle Beach are the ones that are primarily closest to it. And it's their community, not ours. And so the question becomes, you know, what justifies federal intervention into a matter which primarily affects the people who live in this community and their families and local businesses as well? And the federal courts do have a role, but the role seems to me a procedural role, not substantive or micromanaging zoning decisions and that kind of thing. And the procedural role here, as we've been over, was the initial investigation, the city council meeting, the state court proceedings. That sounds an awful lot like due process. And if there's some challenge that can be made to that, it has to be made in a more specific and substantive way than this record makes it. And as I say, you brought forward Mr. Conklin's testimony, and it was never refuted. And I'm just not sure that the case is made in other than conclusory terms as to why the procedural safeguards were somehow inadequate and it would let us just jump into a substantive due process mode. That's part of the problem here. And that's directly what Judge Niemeyer held in Sylvia Development. That's directly what you held on behalf of the court in Tri-County Paving. The federal court's role in these cases is to just ask is the process fair and to make sure that these decisions aren't arbitrary. The result of those processes isn't even a matter for the court. The court has held that what a state tribunal rules and whether there was technically a zoning violation or not is not going to be raised judicata. You can have a case where, and this has happened, where the state court process comes back and says this permit should have been granted or should not have been denied. And that still will not necessarily result in a constitutional deprivation that warrants federal court intervention because that type of granular decision is not the fodder for federal courts on a due process claim as long as the process was fair and the decisions were not arbitrary in a constitutional sense, then there can be no due process violation. At the heart of procedural and substantive due processes was there something arbitrary. And I think that's why Mr. Conklin or whatever testimony was brought forward to show you don't have arbitrariness here. I've looked at this from a national perspective. And if there had been some refutation of it, I just didn't see it. I agree. There is no refutation of that. And this dovetails with their section. And that was brought in to counter any impression of arbitrariness. That's correct. And this gets into their 1985 conspiracy claim where the district court held that in order to state a conspiracy to deprive somebody of equal protection, you have to show that to avoid the intercorporate conspiracy doctrine, you have to show that racial bias was the sole motivating factor for the decision. And I don't think there can be any dispute based on the record here that this concept of public safety and redevelopment of the superblock was at least a motivating factor for the city. To take an originalist perspective here, you would come to the conclusion perhaps that the framers did not want to override the ability of localities to ensure some peace within their geographic boundaries. And at the time of the adoption of the Constitution, there was an ancient tort of public nuisance that was well known to those who framed the Constitution. I think the public tort of nuisance has been alive and kicking since medieval times. And it would be hard to surmise that the Constitution was framed in an attempt to eliminate the localities from taking into account the concept that underlies that venerable tort. And giving legs to that is testimony from Natalie Litzy herself. Ms. Litzy was the owner of Blazin Promotions, which is a business as a tallies bar and grill. At her license revocation hearing, and this is at page 4540 of the JA, she testified to city council, it's a fact that they shoot in the area. Let's clean it up. It's just not my establishment that's suffering. It's everybody in that block. And at the trial here, page 334 of the JA, she complained about the police not doing enough to correct issues involving crime in the superblock. So there can be no doubt that this was at least a part of the motivation of John Peterson and others at the city to clean up the superblock, protect public safety. And if it played just even a part of their consideration, that ends their claims as a matter of law. The court does not need to wade into any of these questions. All right. Thank you, counsel. I'm going to ask my co-panelists if they want to keep you up here a little longer. All right. Thank you all very much. And Mr. Humphrey, I mean, excuse me, Mr. Player, you have some rebuttal time. Come on up. After the initial DV motion, our primary concern was the 1985, even though we weren't presenting evidence. But there's one thing that you keep saying that the expert was not refuted, and I just have to take issue with that. The city's given reason for what they did to my clients was fear of violence in the clubs. And we demonstrated with the sundown meeting with Henry Brewington no violence had occurred, and they had already made that decision. When the email circulated between the police chief, the city manager, and the head of the DRC, no violence had occurred in the clubs except for the one shooting outside of Pure. They targeted minority clubs for closure. If this was a beach community issue with safety, then why are the clubs that had three, four times the amount of violent acts at their clubs never cited for a nuisance? So our claim... You may be right, you may be wrong, but the point is they felt, the city felt that there was a real problem on their hands, and it's hard to believe that they would have taken the steps they took if everything was just proceeding beautifully. But the point is not necessarily whether you are correct or the city is correct. The question is, was there a process that the state provided for you to thrash the issue out? And they had it. They had it there. And that may apply to the 1983. I don't see how that applies to the 1985 when they discriminated. A conspiracy occurred between Peterson, Seba... I don't understand what this conspiracy is in light of the intracorporate doctrine which a corporation cannot conspire with itself, and a city does not conspire with itself. You need some independent party, but the city manager talking to the police chief, those are the kinds of things you want municipal government to do. You want there to be a dialogue within municipal government with the city and the police chief and the inspectors and the rest because you don't address municipal problems by building walls between the different parts of municipal government. And here you have concocted a conspiracy out of nothing more than intragovernmental communications which take place in every locality in the country. The different facets of government are trying to get together and put their collective mind to the question of how can we resolve a problem that is affecting our constituents and how can we be most responsive to what our constituents are concerned about. And you said that kind of behavior which takes place in a democratic polity is a conspiracy? Yes, Your Honor. You can't conspire to discriminate and shut down black bars. And that is a specific exception to the intracorporate conspiracy. That if it's for an improper, unauthorized purpose, then that doctrine does not protect us. So you're leading us to the position that whenever you don't get what you want, there's a conspiracy. No, Your Honor. I'm saying when the heads of the city send emails saying we're going to shut down the black bars, that is a conspiracy to deny them of their equal protection rights. That's where equal protection comes into this. It was the conspiracy amongst the people because the mayor said we didn't authorize this specifically. Dead to the point in his deposition, they were not authorized to seek the acquisition of any ongoing business. And their email showed that's exactly what they did. And it was driven by racial animus. There was a public safety rationale behind it all, and there was also extensive testimony from, I think her name was Stephanie Parron, who is the city's regulatory officer. And she went into, again, unrefuted testimony about the number of non-minority businesses that were denied licensing as well. And whatever Ms. Parron's testimony there, again, was not refuted. You've got all sorts of things that led the district court to direct a verdict here, and it was a lot of very relevant testimony that wasn't refuted. She was refuted. During cross-examination, she admitted that she warned other businesses about the bad promoters, and she did not warn any of my clients. And that was one of the bases they used to take their businesses from them. All right, sir. Thank you. Thank you. We'll come down and recounsel. Mr. Player, I always tell people that if you're sufficiently mad with me, you don't have to shake my hand. But I'm coming down to shake your hand. Oh, yeah. You actually spoke at my law school graduation back in 1994. I spoke at your law school graduation? I think so, yes, sir. Well, congratulations. Did I give you your diploma? I almost gave you a heat stroke because we were in those robes in the quad, and it was, like, 95 degrees outside. I was wondering how you came to work. All I can say is I'm glad some good lawyers, including yourself, were at that graduation, and I'm glad to know I was a speaker. Let's come on down and shake your hand.
judges: J. Harvie Wilkinson III, Allison J. Rushing, Jasmine Hyejung Yoon